

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| WILLIAM KIRKPATRICK, | § | No. 08-14-00255-CR |
| Appellant, | § | Appeal from |
| v. | § | Criminal District Court No. 1 |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC # 20080D04797) |
| | § | |

**O P I N I O N**

In this appeal from a drug possession charge, Appellant challenges his four hour detention during a traffic stop. One might assume that the drugs for the possession charge were discovered in that traffic stop. They were not; the drugs were found in a residence that Appellant had left earlier that day. Some money, and possible drug paraphernalia were found in Appellant's car, but those items were found within the first few minutes of the stop, and as the result of what the trial court implicitly found to be a voluntary consent to search. While the later stages of the stop transgress the Fourth Amendment, we are convinced beyond a reasonable doubt that the elongated detention had nothing to do with Appellant's conviction. Accordingly, we affirm.

**FACTUAL SUMMARY**

Appellant was charged with possession with intent to deliver cocaine (more than 400 grams) and possession of marijuana (more than four ounces, but less than five pounds). A jury found him guilty of those charges, and the trial judge sentenced Appellant to fifteen years on the cocaine charge and one year on the marijuana possession charge. The convictions arose from the seizure of those items from a residence in El Paso on September 24, 2008. A chronology of the events for that day tells the story.

On the morning of September 24th, Lieutenant Kyle Summers, a member of a narcotics unit in the El Paso Police Department, conducted surveillance at an Office Depot parking lot. He testified that he saw Appellant and another man, later identified as Steven Brown, exit the store carrying plastic bins and cardboard boxes which Lieutenant Summers believed are commonly used to ship narcotics. Lieutenant Summers followed Appellant and Brown as they drove to a house on Red Hawk Street.

Appellant and Brown arrived at the Red Hawk address at 12:00 noon. Appellant got out the car and went into the house through the front door. He exited the house a few minutes later and went back to the car. Appellant and Brown then went around to the side of the house where there was an entrance to the garage. They were carrying the items from Office Depot. Lieutenant Summers maintained surveillance from outside; the address was already suspected to be a possible stash house. Appellant and Brown then left the house at 1:30 p.m. and no longer had the Office Depot items with them.

Lieutenant Summers stayed at the house, but had Detective Thomas Lawrence trail Appellant's car. Appellant and Brown drove to a local hotel. They exited the hotel with their luggage about forty minutes later. Appellant got onto an Interstate access road that had three

2

lanes of traffic. Detective Lawrence followed them and testified that he saw Appellant make a turn from the center lane, across the left lane, and then onto an on-ramp to the Interstate. After witnessing what the detective considered to be an improper lane change, he called a marked police unit to make a traffic stop. Detective Lawrence freely admits that he was looking for a traffic violation so they could pull Appellant over.

Officer Hiltl was standing by in a marked police cruiser for just this purpose. Officer Hiltl was assigned to the narcotics section as a K-9 handler. When he got the radio message about the traffic infraction from Detective Lawrence, Officer Hiltl caught up with Appellant's car and pulled him over. The stop was made at 2:36 p.m. Officer Hiltl first asked for and received Appellant's drivers license and insurance information, and Brown's identification. With that information, Officer Hiltl started a warrants check, and while that was on-going, he returned to speak to Appellant.[1] A warrants check can take anywhere from fifteen to thirty minutes depending on how busy the information channel is at the time. Officer Hiltl testified it was busy.

Officer Hiltl asked Appellant to exit the car so they could speak away from traffic on the busy street. Officer Hiltl introduced himself as a K-9 handler, explained that El Paso is a hub for narcotics, and asked Appellant if he had any weapons, drugs, or large amounts of money in his vehicle or on his person. Appellant replied he did not. Officer Hiltl asked if he could search Appellant's person and his car, and according to Officer Hiltl, Appellant agreed.

Appellant had nothing on his person. Officer Hiltl then used his dog to search the car. The dog alerted on the center arm rest of the vehicle. Inside, the officer found just over $5000 in cash. Trained dogs often alert to money because the odor of narcotics is transferred from the

---

[1] The officer did not run the plates or registration at that time. Appellant told him, and the Officer did not believe otherwise, that Appellant had just purchased the car.

3

hand of a person that has touched both narcotics and the money. A similar amount of cash was found in Brown's pants pocket. This initial exchange, including the pat down search and the K-9 search, would have taken twenty to twenty-five minutes.

A further search turned up a roll of tape in a suitcase, a scale found underneath the passenger seat, and a receipt from Wal-Mart for packing items commonly used in shipping narcotics.[2] Detective Lawrence had also followed Appellant from the hotel and at some point came on the scene to assist Officer Hiltl.[3] Detective Lawrence questioned both Appellant and Brown about where they had been and where there were going. He was trying to see if either would admit to having been at the Red Hawk address. Neither admitted to being there.

Back at the Red Hawk address, several officers accompanied by a drug sniffing dog approached the front door of the house for a "knock and talk." Records pinpoint the knock and talk as taking place at 2:41 p.m. As the detectives passed by the garage door, the dog alerted. The detectives knocked on the door and spoke with Douglas Rogers, who along with Sheryl Ramos, were identified as in charge of the residence. Rogers would not consent to a search of the house, and the officers then applied for a search warrant. The warrant was issued at 4:20 p.m. and it was executed just after 5:00 p.m. The search of the home turned up a bundle of marijuana in plain view in the garage. The detectives also found the packaging items that Appellant was seen with that morning and reflected on the Wal-Mart receipt found in Appellant's car. In a laundry room, the detective's found cocaine (491 grams) in a cardboard box. The box was lined with carbon paper and the cocaine was in a plastic bin.

---

[2] Aside from some clothing items, the receipt included the purchase of clear plastic containers, plastic wrap, a spray bottle and vinegar, latex gloves, and sealing caulk.

[3] Detective Lawrence testified that he joined Officer Hiltl about four to five minutes after Appellant was stopped. Officer Hiltl recalled that Lawrence arrived after the money was discovered.

4

Meanwhile, Officer Hiltl was holding Appellant and Brown at the scene of the traffic stop while the other detectives obtained and executed the search warrant on the Red Hawk address. The entire traffic stop took four to four and half hours. Appellant was then placed under arrest.

Appellant, Steven Brown, and Dennis Rogers all testified at trial. Mr. Brown testified that he and Appellant had come to El Paso from Indiana on a kind of vacation, and to look at automobiles.[4] Brown claimed that on the morning of September 24th, they went to a Wal-Mart and then to the Red Hawk address to get their hair cut by Rogers.[5] They also dropped off some items that Rogers had asked Appellant to buy at Wal-Mart. Brown claims that Rogers offered them some marijuana but Appellant declined.

Rogers testified that he was a barber by trade. After being evicted from his shop, he started cutting hair out at his house on Red Hawk. Rogers's sister dated Appellant in 1999 or 2000 at which time he first met Appellant. They kept in touch over the years when Appellant would come into town. He claimed that on September 24th, Appellant came to his house to get a haircut and drop off the packing items that Rogers had asked him to pick up. Rogers testified that he offered Appellant "some weed" but Appellant was not interested. Rogers claimed the cocaine was his and he never showed it to Appellant. Rogers previously pled guilty to possession charges for both the marijuana and cocaine.

The detectives interviewed Rogers following his arrest. In that interview, he claimed that Appellant had asked Rogers to use his house to wrap up the drugs. Rogers told the police that

[4] Appellant was originally tried alongside Brown. The jury acquitted Brown, but could not reach a verdict as to Appellant, and the trial court granted Appellant's motion for mistrial. Following the mistrial, the trial court reconsidered, and then granted, a motion for directed verdict in Appellant's favor which resulted in a dismissal of the indictment. The State appealed that ruling, which this Court reversed in an earlier appeal. *State v. Kirkpatrick*, 08-09-00253-CR, 2011 WL 1312287, at *4 (Tex.App.--El Paso Apr. 6, 2011, no pet.)

[5] A barber's chair was in the garage where the marijuana was found.

5

both Appellant and Brown had wrapped drugs up at the house on other occasions. At trial, however, Rogers claimed that following his arrest he panicked and everything he told the police in his interview was a lie to try and protect himself from a serious drug charge.[6]

Appellant also testified at trial, and similarly described coming to El Paso to look for cars that he bought here, refurbished, and then resold in Indiana. He was carrying cash for that purpose. About a month before, he had purchased the vehicle he was stopped in and was also in El Paso to pick the car up and drive it back to Indiana.[7] While in town, he saw his children from a previous marriage.

On the morning of September 24th, Appellant and Brown went to a Wal-Mart to get some clothing items for their drive back to Indiana. Appellant testified that he never went to an Office Depot. While at Wal-Mart, he got a call from Rogers asking him to pick up some packing supplies. He dropped them off when he and Brown went to Rogers' house to get haircuts. While at the house, Rogers offered to sell Appellant some marijuana, but Appellant declined. Appellant testified that he did not know anything about the cocaine.

## PROCEDURAL BACKGROUND

Appellant filed several generic motions to suppress which challenged the admissibility of any statements that he made and any tangible evidence seized by the police. The transcript of the suppression hearing reflects that Appellant specifically challenged the traffic stop, the length of the detention, and everything that occurred between the initial stop and the arrest. At the hearing, Appellant did not challenge the search of the Red Hawk address. Officer Hiltl and the

---

[6] Rogers was already on probation for a prior possession charge. For this crime, he accepted a plea deal resulting in less than two years' imprisonment. Rogers was living in Colorado at the time of this trial and voluntarily came to El Paso to testify on Appellant's behalf.

[7] He had purchased the car from Rogers' ex-wife and claimed the vehicle still had personal effects in it. He claimed the scale was one of those items and he did not know it was in the car. Appellant also testified that the tape found in his luggage was used to tape up and ship a chess set he had purchased here.

6

detective who secured the warrant for the Red Hawk address testified at the hearing, as did Appellant.

The trial court discounted any criticism of the length of the stop. The court was more concerned with one officer performing a traffic stop based on information obtained from another officer who did not testify at the hearing. The trial court asked for briefing on that issue. We find no written order denying the motion to suppress in the record. At trial, Appellant's counsel represented that the motion had been overruled.

## ISSUES ON APPEAL

Appellant's opening brief, in a single issue, claims that his four hour detention on the side of the road was an unreasonable search and seizure, and "was the substantial cause of the defendant's conviction for the offenses of possession of a controlled substance and possession of marijuana." In his reply brief, Appellant also asks that we consider as a separate issue, the constitutionality of the search of the house where the drugs were found, which was first raised in a motion for new trial.

The State responded to Appellant's original single issue, both on the merits, and by claiming the issue is forfeited. Before addressing these specific arguments, we turn to the standard of review which governs our decision here.

## STANDARD OF REVIEW

We review a trial court's ruling on a motion to suppress for an abuse of discretion. *Crain v. State,* 315 S.W.3d 43, 48 (Tex.Crim.App. 2010). That discretion is tested under a bifurcated standard of review. *Amador v. State,* 221 S.W.3d 666, 673 (Tex.Crim.App. 2007). We give almost total deference to the trial court's resolution of questions of historical fact and of mixed questions of law and fact that turn on the weight or credibility of the evidence. *Arguellez v.*

7

*State,* 409 S.W.3d 657, 662 (Tex.Crim.App. 2013); *Derichsweiler v. State,* 348 S.W.3d 906, 913 (Tex.Crim.App. 2011). We review *de novo* mixed questions of law and fact that do not turn on credibility and demeanor. *Wade v. State,* 422 S.W.3d 661, 667 (Tex.Crim.App. 2013); *Arguellez,* 409 S.W.3d at 662; *Amador,* 221 S.W.3d at 673. We review *de novo* whether the totality of the circumstances is sufficient to support an officer's reasonable suspicion of criminal activity. *Arguellez,* 409 S.W.3d at 663.

When the trial court fails to make explicit findings of fact, such as in this case, we imply fact findings that support the trial court's ruling so long as the evidence also supports these implied findings. *State v. Kelly,* 204 S.W.3d 808, 818 (Tex.Crim.App. 2006); *Carmouche v. State,* 10 S.W.3d 323, 328 (Tex.Crim.App. 2000). While we are usually limited to the record from the suppression hearing, when the parties subsequently re-litigate the suppression issue at trial, we consider all the evidence in our review of the trial court's determination. *See Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex.Crim.App. 2007); *Rachal v. State,* 917 S.W.2d 799, 809 (Tex.Crim.App. 1996).

## THE STOP

Our first struggle is to determine Appellant's actual complaint in this appeal. Nothing about the stop was used to obtain the search warrant for the house where the marijuana and cocaine were found. His detention at the traffic stop at most impacted the trial in three possible ways. First, the State admitted into evidence exhibits and testimony about the money found in the arm rest, the receipt from Wal-Mart, a roll of tape, and the scale. Second, the State introduced through its witnesses certain statements made by Appellant while he was detained at side of the road, but before he was arrested. And finally, at least according to Appellant, the trial

8

testimony was dominated by discussion of what happened during the stop, and not so much about the drugs at the house.

## Physical Evidence from the Car Search

*Preservation Issues*

With regard to the physical evidence, we first turn to issues of error preservation, which we are required to consider whether raised by the parties or not. *Bekendam v. State*, 441 S.W.3d 295, 299 (Tex.Crim.App. 2014)("Because preservation of error is a systemic requirement on appeal, a court of appeals should review preservation of error regardless of whether the issue was raised by the parties."). When a trial court denies a pre-trial motion to suppress, the accused does not need to object during trial to the same evidence to preserve error on appeal. *Moraguez v. State,* 701 S.W.2d 902, 904 (Tex.Crim.App. 1986); *Flores v. State*, 129 S.W.3d 169, 171-72 (Tex.App.--Corpus Christi 2004, no pet.). Our record does not contain any actual ruling on the pre-trial motion to suppress. Failure to obtain an adverse ruling on a motion to suppress waives error. *Dunavin v. State,* 611 S.W.2d 91, 97 (Tex.Crim.App. 1981); *Licon v. State*, 08-03-00386-CR, 2005 WL 82190, at *1 (Tex.App.--El Paso Jan. 13, 2005, no pet.)(not designated for publication). Appellant's counsel at trial, however, stated in the presence of the trial judge and the State's attorney that the motion had been overruled, and neither the judge, nor the State's attorney disagreed. We will therefore assume that the motion to suppress was indeed overruled.

Nonetheless, an accused waives error despite the pre-trial ruling by affirmatively asserting during trial that he has "no objection" to admission of the evidence. *Ex Parte Moore*, 395 S.W.3d 152, 157 (Tex.Crim.App. 2013); *Moraguez,* 701 S.W.2d at 904; *Morales v. State*, No. 08-11-00144-CR, 2013 WL 1235511, at *2 (Tex.App.--El Paso Mar. 27, 2013, no pet.)(not designated for publication). When the State moved to admit the roll of tape (Exhibit Nine) and

9

the scale (Exhibit Ten), Appellant's counsel affirmatively stated that he had no objection. The same is true of Exhibits Five, Seven, and Eight, which respectively are photographs of the money from the center arm rest, the scale, and roll of tape. On the next day of the trial, when the State referenced Exhibit Nine and Ten, Appellant's counsel approached the bench and stated these were subject to the motion to suppress and conceded that he should have objected to them the day before. The trial court accepted that the motion to suppress had "taken care" of preserving error, and overruled the objection nonetheless. Appellant timely objected to the admission of the Wal-Mart receipt (Exhibit Eleven).

We consider the objection to the money, the scale, and the tape, to be waived. The motion to suppress initially preserved objection to these items. But when they were offered into evidence, Appellant affirmatively stated that he had no objection, which negates the suppression motion. We find no authority that allows him to withdraw his waiver of the objection once the exhibits are admitted.[8] Appellant has preserved the objection to the Wal-Mart receipt.

*The Exhibit Evidence*

But even were we incorrect in what error was preserved, we would conclude the trial court did not err in allowing the exhibits into evidence. The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081 (1961). Those protections are implicated whenever a police officer directs a vehicle to stop, however briefly, because the occupant has been "seized" and their freedom of

---

[8] The State asserts a different forfeiture argument based on Appellant's supposed failure below to object to the length of the stop. The original record in this case did not contain the transcribed suppression hearing. Based only the motions that were filed, it was unclear what arguments that Appellant had made to the stop below, and the State contended no objection was made to the length of the stop. Appellant then supplemented the record which reflects that the length of the stop was argued below. We therefore reject the State's forfeiture point as raised in its brief.

movement thus restrained. *Michigan Dept. of State Police v. Sitz,* 496 U.S. 444, 450, 110 S.Ct. 2481, 2485, 110 L.Ed.2d 412 (1990).

Traffic stops are analyzed for Fourth Amendment purposes under the two part inquiry articulated in *Terry v. Ohio*, 392 U.S. 1, 21-22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See Kothe v. State,* 152 S.W.3d 54, 63 (Tex.Crim.App. 2004). Under this standard, we first examine whether or not the officer's decision to stop the vehicle was justified at its inception. *Id.; Whren v. United States*, 517 U.S. 806, 809-10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)(such a seizure is constitutionally "reasonable where the police have probable cause to believe that a traffic violation has occurred.") Second, we determine whether or not the officer's subsequent actions were reasonably related in scope to the circumstances that caused him to stop the vehicle in the first place. *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005)("a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution."). In this case, Appellant does not complain on appeal about the original justification for the stop--the improper lane change--and we omit any discussion of the testimony or issues related to the first *Terry* question.[9]

Under the second *Terry* prong, an investigative stop can last no longer than is necessary to effectuate the purpose of the stop. *Id.* at 507. In other words, if a driver is stopped for some traffic violation, once the police officer issues the citation, the motorist should promptly be

---

[9] The officers conceded that the reason for the stop was a pretext, as they were really investigating the possible stash house. Pretext stops are not improper, per se, so long as the officer has probable cause to believe a traffic offense was actually committed. *Whren,* 517 U.S. at 813, 116 S.Ct. at 1774; *United States v. Robinson,* 414 U.S. 218, 221, 236, 94 S.Ct. 467, 470, 477, 38 L.Ed.2d 427 (1973)(holding that a traffic-violation arrest remains valid despite the fact that it was a mere pretext for a narcotics search and that a lawful post-arrest search of the person remains valid even if it was not motivated by the officer-safety concern that justifies such searches); *State v. Gray,* 158 S.W.3d 465, 469-70 (Tex.Crim.App. 2005); *Overshown v. State,* 329 S.W.3d 201, 205 (Tex.App.--Houston [14th Dist.] 2010, no pet.)("[P]olice may validly stop a vehicle for a traffic violation so long as the stop would be objectively reasonable, regardless of whether the stop is a mere pretext to investigate unrelated criminal conduct.").

released unless the officer develops a reasonable suspicion of additional criminal activity in the meantime. *Id.* at 507. The court has expressly rejected placing any rigid time limitations on *Terry* stops; instead, the issue is "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Kothe,* 152 S.W.3d at 64, *quoting United States v. Sharpe,* 470 U.S. 675, 685-86, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985)(declining to "establish per se rule that a 20-minute detention is too long" under *Terry* ).

Nor may a detention be unnecessarily prolonged solely in hopes of finding evidence of some other crime. *Id.* The stop may not be used as a "fishing expedition for unrelated criminal activity." *Davis,* 947 S.W.2d at 243, *quoting Ohio v. Robinette,* 519 U.S. 33, 41, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996)(Ginsberg, J., concurring). But if reasonable suspicion of additional criminal activity arises in the course of a stop and before the purpose of the stop is fulfilled, then a continued detention may be justified until the new suspicion has been confirmed or dispelled. *See Perales v. State,* 117 S.W.3d 434, 439 (Tex.App.--Corpus Christi, 2003, pet. ref'd).

The "touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno,* 500 U.S. 248, 250, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991). That measure of reasonableness allows police officers to undertake certain actions during a routine traffic stop. They may ask for identification to run a check for outstanding warrants. *Kothe*, 152 S.W.3d at 63-64. They may ask the occupants to exit the vehicle. *Pennsylvania v. Mimms,* 434 U.S. 106, 110-11, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977)(*per curiam*)(noting the government's "legitimate and weighty" interest in officer safety outweighs the "*de minimis*" additional intrusion of requiring a driver, already lawfully stopped, to exit the vehicle); *Maryland v. Wilson,* 519 U.S. 408, 413-15, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997)(passengers may be required to exit vehicle stopped for traffic

12

violation). The police may make inquires of the occupants unrelated to the traffic stop itself. *See Willis v. State,* 192 S.W.3d 585, 590-91 (Tex.App.--Tyler 2006, pet. ref'd)(questions about the driver's destination and the purpose of the trip); *see also Muehler v. Mena,* 544 U.S. 93, 100-01, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005)("We have 'held repeatedly that mere police questioning does not constitute a seizure'. . . . [E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; and request consent to search his or her luggage.").

Two United States Supreme Court opinions provide bookends for our analysis when the stop involves trained drug sniffing dogs. In *Illinois v. Caballes,* an officer had stopped a car for speeding. 543 U.S. at 406. While the officer was handling the matters attendant to the ticket, a second officer came to the scene and had his trained drug dog walk the perimeter of the car. *Id.* The dog alerted, leading to the discovery of narcotics. The total elapsed time to the point when the dog alerted was ten minutes. *Id.* The court upheld the dog sniff because it did not change the character of the traffic stop which was lawful at its inception and otherwise executed in a reasonable manner. *Id.* at 408.

Conversely, in *Rodriguez v. United States*, __ U.S. __, 135 S.Ct. 1609, 1614, 191 L.Ed.2d 492 (2015), a police officer stopped the defendant for veering off the road. *Id*. at 1612. The officer collected the license and registration of the driver and the identification of a passenger. About twenty minutes after the stop was initiated, the officer had issued a warning ticket and completed everything needed for the traffic violation. *Id*. at 1613. The officer then asked for permission to walk his dog around the vehicle. The defendant refused, which caused the officer have the occupants leave the vehicle, and summon a second unit. The canine search led to the

13

discovery of narcotics.  Only seven to eight minutes had elapsed from the time the written ticket was issued until the dog's alert.  *Id*.

But even such a *de minis* extension of the length of the traffic stop did not excuse the Fourth Amendment violation.  The "[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are--or reasonably should have been--completed."  *Id*. at 1614.  "A seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation.  *Id*. at 1611, *quoting Caballes*, 543 U.S. at 407.  *Rodriguez* recognizes, however that the Fourth Amendment tolerates certain unrelated investigations so long as they do not lengthen the roadside detention.  *Id*. at 1614-15.

Applying these principles to the facts of this case, we conclude the evidence supports the implicit finding of the trial court that the search of the car which resulted in the discovery of the cash, the receipt, the scale, and the tape was reasonable.  Officer Hiltl testified that he first asked Appellant and Brown for identification from which he initiated a warrants check.  That check takes fifteen to thirty minutes depending on how busy the system was at the time.  On this day, Officer Hiltl testified that the system was busy.  While the process was underway, he returned to Appellant's car and asked him to exit to the relative safety of the sidewalk.  At that time, he asked Appellant whether he had any drugs or weapons on his person, and obtained permission to search Appellant.  Nothing was found on Appellant and the officer then asked if he could search the car.  The officer claims he was given permission.  While Appellant testified he never gave permission, that conflict in the testimony was best resolved by the trial judge and we do not disturb that implied finding, nor does Appellant challenge it on appeal.

14

With permission to search, Officer Hiltl then had his dog go around the car. The dog alerted on the center arm rest. This entire sequence of events took twenty to twenty-five minutes. The discovery of the drug tinged money was made within the thirty minutes that a warrant check might take on a busy day. We have no evidence, therefore, that the request to deploy the canine unit otherwise delayed the original purpose of the traffic stop. *See Fisher v. State*, 481 S.W.3d 403, 409 (Tex.App.--Texarkana 2015, pet. ref'd)("Accordingly, the key inquiry is whether the information upon which probable cause or reasonable suspicion exists was obtained before the tasks related to the traffic stop's original public safety purpose were completed."). Nor is there any evidence that the traffic portion of the stop was undertaken in an unreasonable manner.

From our record, it is less clear as to when the scale, the tape, and the receipt were discovered. The discovery of those items, however, would have fallen under the umbrella of the consent, which was given within the time period of a reasonable traffic related stop. And once the drug scented money was found, we think it reasonable for the officer to then extend the search based on the fact of that discovery, to determine why Appellant was carrying such a large sum of money that had the scent of narcotics on it.

### The Statements

The motion to suppress, and the trial objection, also challenge the admissibility of the statements made by Appellant during the detention. Appellant's brief does not distinctly address that evidence, but we note the State introduced Appellant's denial of being at the Red Hawk address, and the in the context of the case, that denial would be an incriminating statement. The statement, however, was made near the onset of the stop while the consensual search was still underway. Detective Lawrence, who had actually seen the traffic infraction, continued to follow

Appellant until Officer Hiltl pulled Appellant over. Detective Lawrence recalled that he went to assist Officer Hiltl within four to five minutes of the stop. Officer Hiltl recalled that Lawrence came after the cash was found, which would have been "fifteen minutes or so" from the time of the stop.

Once at the scene, Detective Lawrence then engaged both Appellant and Brown. That would place the potentially incriminating statements as being made very close to the outset of the initial stop. To the extent that Appellant is even challenging the admission of the oral statements that he made, the record does not show they were made at any time other than when the stop was justified under the Fourth Amendment.

### The Continuation of the Stop

Having upheld the physical evidence, and the statements that Appellant made, we nonetheless are also convinced that the stop should have ended after the consensual search. It seems clear to us that the continued detention of Appellant after the search of the car was for no other reason than to hold Appellant while the police were in the process of obtaining and executing a warrant at the Red Hawk address. Officer Hiltl admitted as much at the suppression hearing:

Q. Okay. Did you find anything illegal in that car? Let me back up. Why didn't you just give them their traffic ticket and let them go on their way?

A. Because it was a pretext stop for an ongoing narcotics investigation.

Q. Okay. And then they were held there for approximately two hours before they were placed under arrest?

A. It was around an hour-and-a-half to two hours, yeah. [at trial, he testified to four hours]

Q. What reason was it that they were held there against their will under arrest?

A. It was an ongoing narcotics investigation.

Q. But they were detained, weren't they?

16

A. That's correct. (Supp 23-24)

     ….

Q. So they were detained permanently; they were not going anywhere?

A. They were detained until the narcotics investigation found whether they were involved in it or not, yes.

When the police execute a search warrant at a specific location, they may detain those persons within or immediately outside a residence at the moment the officers execute the warrant. *See Morrison v. State,* 132 S.W.3d 37, 41, 43-44 (Tex.App.--Houston [14th Dist.] 2004, pet. ref'd)(upholding a detention when the police ordered the defendant to lay on the floor and handcuffed him while they performed a search); *see also Dixon v. State,* 206 S.W.3d 613, 619 n.24 (Tex.Crim.App. 2006)(recognizing that it is "well-established that when officers have probable cause to search a person or location, they may temporarily detain *those persons or others* [emphasis added] who arrive during the search"). But the police may not detain persons away from the search location simply because a search is on-going. *Bailey v. United States*, __ U.S. __, 133 S.Ct. 1031, 1035, 185 L.Ed2d 19 (2013). In *Bailey*, the police validly executed a search warrant at an apartment, and also detained the accused, whom they saw exit the apartment about five minutes earlier. He was almost a mile away when the police detained him. *Id*. at 1036. The court held that the detention was an unreasonable seizure of a person under the Fourth Amendment. *Id*. at 1042-43. It rejected the risk of flight as a potential justification for detaining a person who was not at the premises the being searched. *Id.* at 1041.

Similarly, Appellant could not have been held at the traffic stop simply because there was an on-going search at the Red Hawk address. But other than a violation of Appellant's freedom for some period of time, we are also convinced that the excessive detention did not affect the outcome of this case. For constitutional violations, we must of course reverse unless we are convinced beyond a reasonable doubt that the error did not contribute to the conviction.

TEX.R.APP. P.44.2(a).  Here, there was no specific piece of physical evidence found, or statement made, late into detention which was admitted at trial.  Testimony about the length of the detention itself was elicited by Appellant, and not the State's attorney.  Appellant's Reply Brief argues that "a good portion of the trial testimony and the painting of Kirkpatrick as guilty by detention and subsequent arrest" contributed to the guilty verdict.  Beyond this mere claim, however, we find no substantive argument.  We overrule Issue One.

### *JARDINES* ISSUE

As we note above, the drugs were found in the home on Red Hawk when the police executed the search warrant.  The search warrant was based on the alert of a certified drug detection dog.  The dog alerted to drugs in the house as several officers approached the front door on a "knock and talk" with the home's owner.

Appellant's opening brief references the search of the home, and contains a footnote that reads: "[Appellant] raised the dog search in his motion for new trial.  This dog search of the property is exactly the fact pattern that was determined to be unlawful in *Florida v. Jardines* 569 U.S. 1 (2013)."  The State's brief asserts that Appellant has not challenged the search of the home.  In his Reply Brief, however, Appellant asks that we consider as a separate issue whether the search warrant for the home was unconstitutional under *Florida v. Jardines*, ___ U.S. ___, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013) which holds that a narcotic-dog sniff conducted on the front porch of a private residence constituted a search for Fourth Amendment purposes.  Appellant in fact goes one step further, claiming that the State's failure to address the merits of the *Jardines* issue in its brief waives one of the requisites for a Fourth Amendment claim--that the defendant has standing to complain of the search of the premises at issue.

18

We would ordinarily be reluctant to consider as a separate issue a matter referenced only in a footnote to a brief. *See City of El Paso v. Mazie's L.P.*, 408 S.W.3d 13, 17 (Tex.App.--El Paso 2012, pet. denied)(waiver of evidentiary issue raised only in a footnote to a brief). And in our view, a one line sentence in a footnote does not an appellate argument make. Nonetheless, experience teaches that some issues are often best addressed on the basis of something other than briefing deficiencies.[10]

Appellant correctly notes that some of the facts of this case mirror those in *Jardines*. As in this case, the police in *Jardines* went to the front door of a single family residence accompanied by a trained drug sniffing dog. 133 S.Ct. at 1413. The dog began to alert as the officers approached the front porch. *Id*. Based on the alert, the officers obtained a search warrant that led to the discovery of drug contraband inside the house. *Id*. The controlling issue in *Jardines* was whether the implied invitation to walk to the front door of a single family residence includes an implied invitation to bring along a drug sniffing dog. *Id.* at 1416. Based on the "traditional property-based understanding of the Fourth Amendment" the court concluded the implied invitation to come to the front door was not that broad. *Id*. at 1417.

A search warrant cannot be issued unless it is based on probable cause as determined from the four corners of a sworn affidavit. U.S. Const. amend. IV; Tex. Const. art. I, § 9; Tex.Code Crim.Proc.Ann. art. 18.01(b)(West 2015)("No search warrant shall issue for any purpose in this state unless sufficient facts are first presented to satisfy the issuing magistrate that

---

[10] In *Perez v. State*, 08-13-00024-CR, 2016 WL 323761, at *1 (Tex.App.--El Paso Jan. 27, 2016, pet. filed)(not designated for publication), we recount the procedural history of another *Jardines* challenge. In the original appeal, the defendant had not raised *Jardines* issues in his Appellant's Brief at all. The State had done no more than cite *Jardines* in its Appellee's Brief, noting the issue was not raised. We affirmed the conviction. *Perez v. State*, 08-13-00024-CR, 2014 WL 7237732 (Tex.App.--El Paso Dec. 19, 2014)(not designated for publication). In a motion for rehearing, the defendant indirectly raised a *Jardines* argument, not citing *Jardines*, but citing a case that did. We overruled the motion for rehearing without opinion. On petition for discretionary review, the Texas Court of Criminals Appeals in an unpublished opinion vacated our judgment and returned the case for consideration of the impact, if any, of *Jardines. Perez v. State*, PD-0231-15, 2015 WL 4040810, at *1 (Tex.Crim.App. July 1, 2015)(not designated for publication). So as not to risk similarly prolonging this case, we choose to address the *Jardines* issue.

probable cause does in fact exist for its issuance."). We ordinarily give "great deference" to a magistrate's determination of probable cause in issuing a warrant. *State v. Cuong Phu Le*, 463 S.W.3d 872, 876-78 (Tex.Crim.App. 2015). That deference evaporates, however, when parts of the affidavit must be stricken of tainted information. *McClintock v. State*, 444 S.W.3d 15, 19 (Tex.Crim.App. 2014). "When part of a warrant affidavit must be excluded from the calculus, ... then it is up to the reviewing courts to determine whether 'the independently acquired and lawful information stated in the affidavit nevertheless clearly established probable cause.'" *McClintock*, 444 S.W.3d at 19, *quoting Castillo v. State*, 818 S.W.2d 803, 805 (Tex.Crim.App. 1991). Here, the only basis for the probable cause as stated in the affidavit was the drug dog's alert, and taking that portion of the affidavit, leaves no probable cause for issuance of the search warrant.[11]

We reject Appellant's late raised *Jardines* argument, however, for two reasons. First, the issue was not *timely* raised *below*. A party must preserve error, even constitutional error, with a proper objection. *Clark v. State*, 365 S.W.3d 333, 339 (Tex.Crim.App. 2012). As stated in *Lankston v. State,* "all a party has to do to avoid the forfeiture of a complaint on appeal is to let the trial judge know what he wants, why he thinks himself entitled to it, and to do so clearly enough for the judge to understand him *at a time when the trial court is in a proper position to do something about it*." [Emphasis added]. 827 S.W.2d 907, 909 (1992). The first specific challenge to the search of the house based on *Jardines* (or any ground for that matter) was made in a motion for new trial, well after the evidence had been admitted and the jury returned its verdict. As such, the objection simply came too late. *Wilson v. State*, 48 S.W.2d 282, 283 (Tex.Crim.App. 1932)(rejecting challenge to search of the automobile raised for the first time on the motion for new trial).

---

[11] The search warrant application does not mention Appellant, or any of the events of that morning regarding the packaging materials brought to the house.

Even were we required to reach the merits of the argument, however, Appellant is hamstrung by his lack of standing to object to the search of a home for which has no ownership or occupancy interest. The rights secured by the Fourth Amendment are personal, and accordingly, Appellant must show his standing to challenge the admission of evidence obtained by an "unlawful" search or seizure. He can do so only if he had a legitimate expectation of privacy in the place invaded. *Rakas v. Illinois*, 439 U.S. 128, 139, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Appellant carries the burden of proving facts demonstrating that legitimate expectation of privacy. *Villarreal v. State,* 935 S.W.2d 134, 138 (Tex.Crim.App. 1996).

In considering whether Appellant has demonstrated an objectively reasonable expectation of privacy, we examine the totality of the circumstances surrounding the search, including:

(1) whether the accused had a property or possessory interest in the place invaded;

(2) whether he was legitimately in the place invaded;

(3) whether he had complete dominion or control and the right to exclude others;

(4) whether, before the intrusion, he took normal precautions customarily taken by those seeking privacy;

(5) whether he put the place to some private use; and

(6) whether his claim of privacy is consistent with historical notions of privacy.

*Granados v. State,* 85 S.W.3d 217, 223 (Tex.Crim.App. 2002); *Villarreal,* 935 S.W.2d at 138. This is a non-exhaustive list of factors, and no one factor is dispositive. *Granados,* 85 S.W.3d at 223. Appellant has not demonstrated he has standing under any of these elements.

Appellant was not shown to have an ownership interest in the property. He was a guest at the house, but he claims to have left the premises for good and was headed out of town at time of the search. *Cf. Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990) (holding that an overnight guest has a legitimate expectation of privacy in his host's home) with

*Villarreal,* 935 S.W.2d at 137 (an invited guest who spent a couple of hours in the residence for a business transaction "who has no possessory or proprietary interest in the premises, but is a guest, has no clothes in the house, or other belongings, has no legitimate privacy interest in the premises searched"). Appellant had no dominion or control over the house, or the right to exclude others. We simply find nothing in the record that supports Appellant having standing to challenge the search and seizure conducted in the Red Hawk house.

We also expressly decline Appellant's invitation to find that the State waived any complaint about standing by not briefing the merits of the *Jardines* issue. The State can hardly be faulted for not briefing an issue raised at best in passing in a footnote in Appellant's brief. Even at that, we are entitled to raise the issue standing ourselves when the parties do not. *Kothe v. State*, 152 S.W.3d 54, 60 (Tex.Crim.App. 2004)("The appellate court may raise the issue of standing on its own."); *State v. Brady,* 763 S.W.2d 38, 42 (Tex.App.--Corpus Christi 1988, no pet.)(addressing issue of defendant's standing to challenge search although not raised by either State or defendant in trial or appellate court). Consequently, we overrule the *Jardines* issue and affirm the judgment of the trial court.

October 19, 2016

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Hughes, JJ.

(Do Not Publish)

22